# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 3:18-cr-59 |
| Plaintiff, | : | Judge Thomas M. Rose |
| v. | : | |
| JOHNNIE LEE BONNER, III, | : | |
| Defendant. | : | |

## ENTRY AND ORDER DENYING MOTION TO SUPPRESS (DOC. 22)

This case is before the Court on the Motion to Suppress (Doc. 22) filed by Defendant Johnnie Lee Bonner ("Bonner"). On April 24, 2018, the Grand Jury returned a two-count indictment against Bonner. (Doc. 15.) Count 1 alleges felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) & 924(a)(2). Count 2 alleges possession with intent to distribute a mixture or substance containing a detectable amount of cocaine in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C). Bonner entered not guilty pleas to both counts. (Doc. 18.)

On June 8, 2018, Bonner filed the Motion to Suppress. (Doc. 22.) He seeks suppression of all evidence seized by law enforcement and all of his statements to law enforcement. On October 29, 2018, the Court held a hearing on the Motion to Suppress. (Doc. 26.) On November 28, 2018, the Government filed a Response in Opposition (Doc. 27) to the Motion to Suppress. At Bonner's request, the Court extended his deadline to file a memorandum in response to the Government's Opposition to December 10, 2018. On December 12, 2018, Bonner filed his responsive memorandum. (Doc. 29.) Despite its tardiness, the Court has considered Bonner's

responsive memorandum along with his original Motion to Suppress. This matter is therefore ripe for review.

For the reasons below, the Motion to Suppress is **DENIED**.

I. **FINDINGS OF FACT**

The following findings are made based on the evidence submitted by the parties and the testimony at the October 29, 2018 hearing on the Motion to Suppress.

On April 4, 2018, Dayton Police Officers Michael Schwartz and Thadeu Holloway were performing routine patrol duties in their marked police cruiser while wearing their respective uniforms of the day. Both Officers were members of the Dayton Police Department's Greater Dayton Premier Management Authority (GDPMA) Task Force. The mission of this task force is to patrol and surveil GDPMA managed properties for possible criminal activity.

At approximately 9:30 PM, the officers drove into a dimly lit and nearly empty parking lot located at the 900 Block of Danner Ave. adjacent to the Desoto Bass Public Housing Complex in West Dayton, Ohio. Desoto Bass is owned and managed by GDPMA. Although the parking lot could accommodate 75-100 cars, only 3-4 parked cars were observed on this evening. No individuals or pedestrians were otherwise observed in the lot. It was cold (approximately 35°F) and dark outside. Officers Schwartz and Holloway knew the Desoto Bass area to possess the highest crime rate for gun shootings, felonious assaults, drug crimes and property crimes in the entire City of Dayton.

On entering the lot, the officers noticed a parked gray GMC Jimmy SUV with an Ohio temporary license plate. The SUV was backed into a resident parking space. A black male, later identified as Bonner, was inside the SUV straddling the area between driver's seat and front

passenger's seat. The SUV's engine was not running, its windows were closed, and neither its headlights nor interior lights were illuminated.

Schwartz exited the police cruiser and approached the passenger side of the SUV, while Holloway approached the driver's side. Neither officer had his weapon drawn. As they approached, they observed the car's stereo was half-way removed from the front dash yet still connected to electricity due to the fact the unit's lights were illuminated. Based on the totality of the circumstances, both officers suspected that Bonner was stealing the SUV's radio.

Bonner appeared startled when confronted by the officers. Holloway asked Bonner to identify himself and explain what he was doing. In response, Bonner moved into the driver's seat and said that he had bought the SUV that day and was installing the radio. The officers asked for a form of identification, and Bonner provided an identification card. That evening, Bonner never produced a driver's license or proof of vehicle ownership. The temporary Ohio license plate attached to the SUV's rear was later determined not to match its make and model.

After producing his identification card, Bonner continued reaching into his back pockets. Holloway and Schwartz both perceived this movement as potentially threatening and an officer safety issue. Despite repeated directions from the officers to cease and desist, Bonner continued to place his hands in his rear pockets. Based on his refusal to comply with multiple instructions to stop reaching into his rear pockets, Bonner was removed from the SUV, patted down and detained in the back seat of the police cruiser pending further investigation. After securing Bonner, Holloway input Bonner's personal identification information into the LEADS and MIS computerized law enforcement data bases. Holloway learned that GDPMA had issued Bonner a three-year "no-trespass order" which specifically included the Desoto Bass Complex. This "no-trespass order" stemmed from Bonner's unauthorized discharge of a firearm at Desoto Bass;

3

together with his fleeing from the police; and stalking and causing criminal damage.  Violation of a "no-trespass order" is a criminal trespass (M-4) under the Ohio Revised Code.

In the meantime, Schwartz spoke with a nearby Desoto Bass resident who claimed to know Bonner.  Soon thereafter, Dayton Police Officer Zachary Banks arrived to provide Officers Schwartz and Holloway "backup" with the situation.  Banks immediately approached the SUV with his flashlight to determine if any other individuals were inside.  From outside the vehicle, Banks observed in plain view a digital scale with apparent drug residue sitting on the front passenger seat.  Based on this discovery, Banks briefly searched the passenger compartment and discovered a loaded 9mm handgun underneath the driver's seat.  Banks advised Holloway of his observations prior to departing the scene to respond to another police call.

Holloway re-approached the SUV to verify Banks' discoveries.  Holloway next confirmed with the Dayton Police Department that Bonner had a criminal record that disqualified him from possessing a firearm.  Holloway advised Bonner of his *Miranda* rights and proceeded to question him.  Bonner reiterated that he was simply attempting to install the radio.

Based on the discovery of drug paraphernalia found in plain view; the discovery of the loaded handgun; the lack of a valid driver's license; no proof that Bonner owned the vehicle; Bonner's pre-existing GDPMA no-trespass order; and the discovery that the Ohio temporary license attached to the SUV did not match its make and model, the vehicle was impounded in accordance with Dayton Police Department policy.  An inventory search was performed on the SUV before it was towed away.  The handgun, digital scale and an Ohio Certificate of Vehicle Title issued in the name of Forest J. Trupp were all seized as result of the inventory search.

II. **ANALYSIS**

The Fourth Amendment to the United States Constitution protects the rights of individuals against unreasonable searches and seizures conducted by state actors.  *United States v. Ganias*,

755 F.3d 125, 133 (6th Cir. 2014). A search occurs when the Government acquires information by either "physically intruding on persons, houses, papers, or effects" or otherwise invading an area in which the individual has a reasonable expectation of privacy. *Id.* (citing *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013)). "A seizure occurs when the Government interferes in some meaningful way with the individual's possession of property." *Id.* (citing *United States v. Jones*, 565 U.S. 400 n.5 (2012)). The party seeking suppression of evidence obtained by a search has the burden of proving that the search was unlawful. *United States v. Blakeney*, 942 F.2d 1001, 1014 (6th Cir. 1991).

Bonner argues that the Dayton Police did not have a legal basis to detain him or search the SUV that was impounded, and that his statements to the Dayton Police are inadmissible because he never waived his Fifth Amendment right against self-incrimination. (Doc. 22.) The Court addresses each of these arguments in turn.

There are three kinds of permissible encounters between the police and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Smith*, 594 F.3d 530, 535 (6th Cir.2010) (internal citations omitted). All seizures— including brief investigatory stops—are subject to Fourth Amendment scrutiny, although purely consensual encounters are not. *United States v. Beauchamp*, 659 F.3d 560, 566 (6th Cir. 2011).

Here, both the Government and Bonner agree that the police initially engaged in an investigative detention under *Terry v. Ohio*, 392 U.S. 1 (1968). The Sixth Circuit has described the requirements that must be met to conduct a permissible stop under *Terry* as follows:

> *Terry*, a limited exception to the normal requirements of probable cause, permits a police officer briefly to detain a person or property for investigative purposes if the

> officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur. *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 543–44 (6th Cir. 2002). In evaluating the constitutionality of a *Terry* stop, we engage in a two-part analysis of the reasonableness of the stop. We first ask "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion." *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993) (internal quotation marks and citation omitted). In answering this question, we examine the totality of the circumstances to determine the reasonableness of the investigatory stop. [*United States v. Bailey*, 302 F.3d 652, 658 (6th Cir. 2002)] (citing *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)).
>
> Next, if we conclude that the basis for the *Terry* stop was proper, then we must determine "whether the degree of intrusion ... was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Garza*, 10 F.3d at 1245 (internal quotation marks and citation omitted). As part of the second prong, we must "ascertain whether the detention is reasonable, that is, (1) was it sufficiently limited in time, and (2) were the investigative means used the least intrusive means reasonably available." *Bennett v. City of Eastpointe*, 410 F.3d 810, 825–26 (6th Cir. 2005) (internal quotation marks and citation omitted). For while a *Terry* stop may be constitutionally permissible initially, it may become an impermissible "seizure if it occurs over an unreasonable period of time or under unreasonable circumstances." *United States v. Orsolini*, 300 F.3d 724, 729–30 (6th Cir. 2002) (internal quotation marks and citation omitted); *see also United States v. Heath*, 259 F.3d 522, 530 (6th Cir.2001) (citing *United States v. Place*, 462 U.S. 696, 709, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)) (noting that "the Supreme Court has held that the passage of time can cause an investigative detention to ripen into a defective seizure that must be based upon probable cause"). Simply put, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). While there is "no rigid time limitation on the lawfulness of a *Terry* stop" (citation and internal quotation marks omitted), we must "'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *Orsolini*, 300 F.3d at 730 (quoting *United States v. Sharpe*, 470 U.S. 675, 687, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)).

*United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005).

Under the first step of the *Terry* analysis, the police officers must have been aware of specific and articulable facts that gave rise to a reasonable suspicion of criminal activity. Bonner argues that the officers did not have such facts, but instead inappropriately relied on ambiguous

facts and their hunch that Bonner was engaging in criminal activity. *See Beauchamp*, 659 F.3d at 569-70. Based on the totality of the circumstances, the Court finds that the police officers did not act on a hunch, but on a reasonable, articulable suspicion that Bonner was stealing a car radio. It was late in the evening on a cold night in a dimly lit parking lot in a neighborhood known for its high incidence of criminal activity. The officers came upon a man inside an SUV straddling its center console with its radio in his hands. It was an odd time to be installing a car radio. Given these circumstances and the fact that no one else was present in the parking lot (suggesting the man might have been taking advantage of an opportune time to steal a car radio), the police officers had a reasonable suspicion that Bonner was engaging in criminal activity.

The second prong of the analysis asks whether the officers' intrusion on Bonner was reasonable in light of the scope of the situation at hand. It was. The officers approached the vehicle and asked Bonner for identification and to explain what he was doing. That was the extent of the initial stop. Once Bonner continued reaching into his back pockets, despite the officers' instructions to stop doing so, they were further justified in frisking Bonner for their own safety and placing him into their cruiser while they determined whether or not a crime, in fact, was being committed.

Bonner argues that, when the officers placed Bonner in their vehicle, the investigatory stop transformed into an arrest that must be supported by probable cause. The Court disagrees. At that point, Bonner had told the officers that he owned the SUV, but he had not produced a driver's license or any proof that he owned the vehicle. Thus, the officers were still "checking out the suspicious circumstances that led to the original [*Terry*] stop." *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994). The officers ran Bonner's name through their databases and learned that

he was engaging in a crime, albeit a different one, in that he was in violation of a no-trespass order issued against him.

When the police officers discovered the violation of the no-trespass, they had probable cause to arrest Bonner. Shortly thereafter, another officer reported that he saw a scale with apparent drug residue on it in plain view in the SUV. Observation of the drug paraphernalia justified the reporting officer's search of the vehicle, which revealed a handgun. *See California v. Carney*, 471 U.S. 386, 392-93 (1985) (discussing automobile exception to warrant requirement).

The officers impounded the SUV because, as required by department policy, Bonner was being arrested, there was no registered owner on the scene, and they did not want to leave the vehicle unoccupied in a high-crime area. Because the vehicle was being impounded, the officers conducted a warrantless inventory search, during which they located the scale and handgun that had been reported to them earlier. The search was valid and reasonable under the circumstances.

Finally, Bonner argues in his memorandum that his statements should be suppressed because the officers did not conduct a lawful *Terry* stop. As discussed, the Court has found the *Terry* stop was proper. The Court also notes that Bonner was read his *Miranda* rights once it became apparent that he would be placed under arrest.

### III.   CONCLUSION

For the reasons above, the Court **DENIES** Bonner's Motion to Suppress (Doc. 22).

**DONE** and **ORDERED** in Dayton, Ohio, this Thursday, December 20, 2018.

                                                      s/Thomas M. Rose

                                            THOMAS M. ROSE
                                      UNITED STATES DISTRICT JUDGE